James LARGOTTA, Plaintiff,

v.

BANNER PROMOTIONS, INC. and
Arthur Pelullo, Defendants.

No. 04 Civ. 7005(JSR).

United States District Court,
S.D. New York.

Feb. 28, 2005.

Marc Bernstein, Bernstein & Bernstein, New York, N.Y. for Plaintiff.

George Alexander Bochetto, Bochetto & Lentz, P.C., Philadelphia, PA, for Defendants.

## MEMORANDUM OPINION

RAKOFF, District Judge.

On January 24, 2005, the Court denied defendants' motion to dismiss or transfer this case for improper venue and granted their motion to dismiss all claims against defendant Arthur Pelullo and all tort claims against both defendants. *See* Order, 1/24/05. This opinion briefly sets forth the reasons for those determinations.

With respect to the venue motion, the Court held a two-day evidentiary hearing on November 1, 2004 and January 4, 2005. Although the witnesses gave rather starkly differing accounts of the events in question, in the end the Court need not resolve these discrepancies, because the facts, even when taken most favorably to defendants, show the following:

Plaintiff James Largotta lives in Manhattan. Transcript, 12/1/04 ("Tr. I"), at 9; Transcript, 1/04/05 ("Tr. II"), at 26. Pelullo lives in New Jersey and his Banner Promotions office is in Philadelphia. Tr. II at 15. In or around January of 2001, Pelullo was introduced to Largotta by their mutual friend Henry Siegel at a restaurant in Manhattan. *See* Decl. of James Largotta dated 11/15/04 ¶ 3; Tr. II at 6. At

that meeting, Pelullo, who is a boxing promoter, told Largotta about his troubles with the boxing champion Acelino Freitas. Tr. II at 14. Pelullo had been Freitas's manager, but Freitas had become alienated from Pelullo because Freitas blamed Pelullo for an incident in which Nevada police handcuffed Freitas in the boxing ring. Since Freitas, a native of Salvador, Brazil, spoke only Portugese, and since Freitas refused to have anything to do with Pelullo in any event, Pellulo was struggling to find a way to re-establish contact with Freitas and to convey his position that he was blameless. *See id.* at 15, 19–20, 26. Largotta told Pelullo that Largotta's wife, Elizabeth, not only spoke fluent Portugese but was from Salvador. *Id.* at 14.

Soon thereafter, Pelullo called Largotta and proposed that Elizabeth Largotta reach out to Freitas. Tr. II at 15. After making a few calls, Elizabeth Largotta discovered that she had a connection with Freitas's family, which she and her husband then used to open telephonic communications with Freitas, *id.* at 27. The Largottas placed these calls from New York. Tr. I at 12. In the course of the calls, Freitas told Elizabeth Largotta that he had been embarrassed and did not want to deal with Pelullo anymore. Tr. II at 29. When Largotta telephonically relayed Freitas's position to Pelullo, Pelullo explained in detail what had taken place in Nevada and sent to the Largottas in New York related legal papers, so that the Largottas could clarify the situation for Freitas and his handlers. *Id.* at 29.

The Largottas then placed further telephone calls to Freitas from New York. Eventually, through these efforts of the Largottas, arrangements were made for the Largottas and Pelullo to meet Freitas's representatives in Rio de Janeiro in late May. Tr. II at 18. Pelullo made the travel arrangements, which included a flight out of Newark, New Jersey. *Id.* at 18–19. Elizabeth Largotta, who once worked at a hotel in Rio de Janeiro, arranged reservations there for a discount. *Id.* at 36. At the meeting in Rio, the misunderstanding between Pelullo and Freitas was resolved, and an agreement was reached in principle for a new management contract, with only minor details left open. *Id.* at 37, 41. Another meeting was arranged for the middle of June, this time in Salvador. *Id.* at 20–21.

Between the meetings, Largotta updated Pelullo frequently by phone, with Largotta speaking from New York and Pelullo from Philadelphia. *Id.* at 17. According to Pelullo, he and Largotta did not again meet physically in New York.[1] *Id.* at 17. Pelullo also testified that there was never any discussion at or prior to this time about compensating the Largottas, *id.* at 16, 20, and that there was no explicit understanding that the Largottas would be compensated for their efforts. *Id.* at 21. However, he acknowledges that he did not assume the Largottas were working for free and that he expected the Largottas "were going to ask me for something." *Id.* at 21. Pelullo states that he did not need anyone's help in negotiating a boxing contract, but that the Largottas provided him a service in getting Freitas to give him a face-to-face meeting. *Id.* at 27, 32.

For the second meeting in Brazil, the Largottas and Pelullo boarded a plane in Newark on June 12 and arrived in Salvador on June 13. Decl. of Arthur Pelullo dated 10/7/04 ("Pelullo Decl.") ¶ 14. During the flight, Largotta presented Pelullo with a piece of paper describing his pro-

1. However, his own witness acknowledges that Pelullo, Largotta and Siegel all attended a dinner in New York during this time at which Pellulo and Largotta discussed boxers. Tr. I at 11–12 (testimony of Henry Siegel).

posed compensation. Tr. II at 22. He said that if Pelullo did not agree to the terms presented, the Largottas would use their influence over Freitas to sink the deal. Pelullo Decl. ¶¶ 18–21. Largotta asked Pelullo to retype the contract on Banner stationary, which Pelullo had an assistant do. Tr. II at 23. Although the contract is dated June 4, 2001, it was signed in Brazil on June 14. *Id.* at 24. It obligates Pelullo to pay Largotta $50,000 within fourteen days of the signing and thereafter to pay Largotta ten percent of the net revenue Banner Promotions earns from its exclusive promotional contract with Freitas. *See* Pelullo Decl., Exhibit A (Agreement).

On August 25, 2004, Largotta filed the instant lawsuit, asserting that Banner and Pelullo have earned millions of dollars from Freitas's fights and have failed to pay him the required ten percent. *See* Complaint ¶¶ 12–15, 48.

■ A civil claim in diversity may be brought, among other places, in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."[2] 28 U.S.C. § 1391(a)(2). In applying this test to contract claims, courts "consider a number of factors, including where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred." *PI, Inc. v. Quality Prods., Inc.*, 907 F.Supp. 752, 757–58 (S.D.N.Y.1995). The fact that substantial activities also took place in other districts, and hence that venue is also proper there, does not preclude a finding that venue is proper in the Southern District of New York. *Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C.*, 927 F.Supp. 731, 735 (S.D.N.Y.1996).

■ According to Pelullo's version of events, Banner's contract with Largotta was executed in Brazil. Banner's obligation, to make payments to Largotta, was to take place from its office in Philadelphia; its alleged breach is therefore also situated in Philadelphia. As Banner points out, the fact that it was to mail payments to Largotta's residence in New York would not alone provide venue. *See Zumft v. Doney Slate Co.*, 698 F.Supp. 444, 446 (E.D.N.Y.1988) (finding that mailing of payments to New York is insufficient for finding that claims arose there).

However, other events are relevant to this motion. Pelullo's argument that all the prior conduct in New York is immaterial for venue purposes because the contract had not yet been executed is simply wrong; indeed, if this were so, it would be illogical for courts to consider the venue in which negotiations (by definition pre-execution) took place, as courts routinely do. *See, e.g., PI, Inc.*, 907 F.Supp. at 758; *Sacody Techs., Inc. v. Avant, Inc.*, 862 F.Supp. 1152, 1157 (S.D.N.Y.1994).

Moreover, negotiations aside, Largotta largely performed his contractual obligations in New York. Although Elizabeth Largotta provided some interpretive services in Brazil, by Pelullo's own admission the real value the Largottas provided was in convincing Freitas's aides and then the fighter himself to have face-to-face meetings where Pelullo could clear up the misunderstanding. The Largottas performed that work, telephonically, entirely from New York. The fact that their performance occurred before the formal written contract was entered into is irrelevant, for it was still this performance for which the contract in effect proposed to compensate them.

---

**2.** There is no claim to venue based on any    other provision.

 

In addition, while according to Pelullo the final terms of the contract were fixed outside New York, with little negotiation, he concedes that the broad outline of the deal—the work the Largottas were to perform, and the mutual (if implicit) expectation that they would be compensated—had been in established in a series of earlier conversations. During this time, at least one party to the conversations (Largotta) was always in New York, and for at least two relevant conversations Pelullo was in New York with him. The fact that Pelullo often was elsewhere during these conversations simply means that venue would also be proper in other locations, not that it is improper in New York. *See, e.g., Schomann Int'l Corp. v. N. Wireless, Ltd.,* 35 F.Supp.2d 205, 213 (N.D.N.Y.1999) (finding that agreement negotiated by phone, fax and letter without face-to-face contact was "negotiated and executed in both New York and Iowa"); *Sacody Techs.,* 862 F.Supp. at 1157 (stating that venue standard "may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action"). Thus, venue is proper in the Southern District of New York.

Turning to the motion to dismiss all claims against Pelullo in his personal capacity and to dismiss all tort claims against both defendants, plaintiff concedes these motions are well-founded and must be granted. *See* (as to personal claims) *W. Joseph McPhillips Inc. v. Ellis,* 278 A.D.2d 682, 683, 717 N.Y.S.2d 743 (3d Dep't 2000), and (as to the tort claims) *N.Y. Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995); *Fesseha v. TD Waterhouse Inv. Servs., Inc.,* 305 A.D.2d 268, 269, 761 N.Y.S.2d 22 (1st Dep't 2003).

Accordingly, defendants' motion to dismiss or transfer for improper venue is denied, and defendants' motion to dismiss all claims against Pelullo in his personal capacity and to dismiss all tort claims against both defendants is granted.

SO ORDERED.